Alright, we'll begin with Griffin v. Hartford Life and Mr. Grabhorn. Good morning, if it pleases the court. My name is Michael Grabhorn. I represent Scott Griffin, the Plaintiff and Appellant, in this action. As the court is probably well aware, this is an ERISA action involving the termination of disability benefits under a single policy. It involved monthly income and also... Can you pull out a microphone? Sure. Is that better? Yeah, that's better. Thank you. Involved, like I said, an ERISA long-term disability insurance policy as well as a life policy where a disability benefit is provided. In this case, at the instance where we're dealing with, where Mr. Griffin is unable to perform the essential duties of any occupation for which he is reasonably trained and educated. A quick history on the policy itself for the benefits. Mr. Griffin, a resident of Lichford, Virginia, was employed by Immodal and covered by the plan. I believe he began disability benefits, which were approved by Hartford in 2012 on the long-term disability monthly income benefit on the basis of inability to do his job duties at Immodal. Twenty-four months, the benefits then changed in the definition to an any occupation definition, whereby, as I mentioned earlier, where we get into the essential duties test of whether or not he can perform, currently perform, the essential duties of any other occupation for which he is reasonably trained and educated. During the same period of time, the life disability benefit under the same policy was being provided from the start through the termination in 2015, whereby, excuse me, 2014, whereby he was unable to perform already and been determined unable to perform the essential duties. The plan documents give the administrative discretion, do you think? Absolutely. Those are the issues really before the court today. The two issues that we've posited for appeal, because this is always significant to the resolution of an ERISA case. What is the standard of review? We have the Supreme Court in Glenn v. MetLife, which tells us that the standard of review, the default standard of review is de novo. The court reviews the record and the evidence before the plan administrator at the time the decision was made and makes a resolution or decision of its own accord without any deference to the plan administrator. Or alternatively, if the plan provides the discretionary language, which Glenn does not really enunciate what satisfies that, and we don't need to get into that. We've already stipulated and agreed that the language in the policy would do that. There is discretionary language in the insurance policy. That's not in dispute. But there's a second part of that test, which has been fleshed out across the circuits right now, is just because you have the language doesn't mean you have automatic, arbitrary and capricious review. You have to have someone who is a fiduciary exercise that discretion. In this instance, we posit that Hartford Life and Accident Insurance Company, who we've now learned in other litigation as well as here, has no employees. It cannot possibly make a decision. What has it done? It has done what a number of other insurance companies do that are in the insurance market from a cost standpoint. They hire a third party, in this case Hartford Fire, which is a separate legal entity within the chain of the Hartford financial groups and so on. We laid out a chart, I believe, on that in the briefing, to do the administration. The people that made the decision here, they've admitted that they were the sole responsibility for making the decision. I think you have a lot better arguments to make than this one. I can tell you the policy was issued by Hartford Accident. The claim was made to Hartford Accident. Every letter sent to your client came from Hartford Accident. The decision was on a document from Hartford Accident. These people who signed on behalf of Hartford Accident were paid by Hartford Fire, but that's not evident in the handling of the claims. It's probably a borrowed agency kind of arrangement that is fairly common. The idea that this was not the decision of Hartford Accident was denied by the record 100%. With due respect, Judge, I would disagree on the facts here because, one, I think what's happened here is that Mr. Griffin did not bear the burden of proof on this issue. No, but he got a letter from Hartford Accident every time. It's a Hartford Accident, signed by Hartford Accident, and every decision was made by Hartford Accident. The denials were, the appeals were. I can, you can keep arguing it. I'm going to carry on. I understand. I understand. Mr. Griffin, let me turn your attention to the other issue of the adequacy of this review. It's a low bar, but it's not an absence of review. Let me make sure I understand the facts here. For three years, the appellant received benefits. The last, in March of 2014, it was determined in the more rigorous, any occupation standard, it was determined the medical record supported disability. Is that not correct? Yes, Judge. And part of that record was a report from the treating physician, Dr. Karmusha, a board certified orthopedist, that the insured had severe spine degeneration, entire lumbar spine, and was looking at massive surgery involving rods and pedicle screws from the mid spine to the lower back. Am I right about that? Yes, Judge. And based upon that, the insured was awarded full benefits. But within six months, that's all turned around after three years of review. What was the new evidence after March of 2014? We would say there's none. And I know this has been in the briefing the parties addressed, the change, what we call a change in condition over time, because as the Supreme Court said in Glenn, the insurance companies, even though they get the deferential review on the orthopedic standard, they're held to a higher fiduciary duty here when they're doing these analyses. And Judge Moon, when we did oral argument on this, asked me as far as the shift in the burden. And no, there's not a shift in the burden here. But what there is, it operates as almost an estoppel, some sort of reliance with respect to the participant in that you can't suddenly take all the evidence and have a different outcome six months later with nothing has changed. And I would posit an answer to you. But the different difficulty here is when you dig into the record, and this is a hard record review. It's the way it's printed. It's very hard to follow, but I did. And it's very clear the medical case manager says the patient, the insured is disabled, can't sit for a long time. They go and try to get a second opinion. That second opinion is given to the treating physician. And then they award benefits. And then six months later, which I can't see anything else in the record, suddenly what was good enough then is no longer explainable. And they're taking information that existed before that was apparently completely unpersuasive, and they're using that as an excuse now to take the man's benefits away after three years. Yes, Judge. The thing that I think will be cited, or at least it was in the letter, and Hartford has abandoned it in litigation, was the surveillance. They conducted, I think it was four days of surveillance, and had less than two hours of activity where he had to go to the store and get groceries, pick up, I believe, his son up from school and that sort of thing. It's not even in the record. The video, we checked, the Fourth Circuit doesn't even have it. I understand. And we pointed that out as well, that it's a deficient record. And that's one of the reasons why, before Judge Boone, because Mr. Griffin was pro se. He was unrepresented, as a lot of individuals are, during the claims and appeals process. And they don't know, check the eyes, check the eyes, not the eyes, that sort of thing, whether or not to push them to get him a copy of that so he'd actually see it versus the written document itself, summary. Is anything wrong with the surveillance? Are you contesting the company's right to make a surveillance? Oh, I don't think there's anything wrong with doing surveillance in and of itself, Judge. But what I do think is that surveillance, it can be helpful in certain instances, obviously, depending on what the underlying condition is. But I don't think you can use it to undermine medical. It didn't show anything. It showed him doing activities of life. Bear in mind, the definition here, and Judge Gergel, as you already pointed out, not only did they already find him. Did the surveillance show that he was picking up his child at school and shopping and the like? It showed, I believe, that he went to the grocery or went to the store. He picked his son up at school, absolutely. But the definition of disability here, how did that translate? Their own doctor said it. And in fact, in the transcript, and I can pull the transcript, Hartford has said, we're not relying on that. Are we in the phase of the policy which requires that the plaintiff be unsuited for any occupation? Yes, it's during the any occupation definition. The definition of this policy says that he has to be able to, well, excuse me, he has to be able to perform the essential duties. The inability to perform one or more of the essential duties means that he remains disabled, just as he had for 30 months under the life waiver premium definition, as well as for the prior six months under the long-term disability definition that George Gergel mentioned. That's a pretty broad definition. Oh, sure it is. Now, the problem is... He can't perform the essential tasks of any occupation. How long did they actually afford him disability benefits, long-term disability benefits? They paid him long-term disability benefits for roughly, I want to say, about 30 months. About 30 months. Which means that he also had to satisfy... I don't remember if it was a 90-day or six-month waiting period for short-term disability benefits. And so when we add those all together, roughly about three years of benefits were provided for disability. But the definition changed from present occupation. In March of 2014, it went to any occupation. The more demanding, broader, any occupation. But Hartford wrote a letter and said, did you meet that qualification for disability? Yes, they met the letter and then the record does show, and we saw it repeatedly in the briefing, where internally they recognized this supports ongoing disability under any occupation standard. And then before that, nothing changed. If someone's condition changes during the period of long-term disability, or there's new evidence that comes to light is the company precluded from terminating benefits? No, I wouldn't take that position, Judge. I mean, things can happen over time. Someone can have a condition that resolves itself. That's not what we're... What we're saying is nothing changed. That's what my question is, and Jeff Wilkerson's absolutely right. You could have a situation where the condition improved and the company's completely within its rights to reconsider. But I couldn't find anything that changed. And I would agree, Judge. Well, now, there was an interview with him. Who was the interview conducted by? This was conducted by one of the Hartford Fire employees, I believe. Well, they come out, and I'll sit someone down and ask them a bunch of questions about their education, how they're feeling, what are they doing on a daily basis. They were making the argument that as a result of the interview, he said that he hadn't seen a doctor for a year. He couldn't afford it, Judge. And that he was only intermittently taking any medication. Right. He was treating for chronic pain. The problem is income. This is not a highly paid individual, as the record reflects. And he has no health insurance. And unfortunately, in this day and age, this is an economic reality that if you cannot pay for treatment, you don't get it. In fact, there are references to the fact that he wants further evaluation but cannot afford to get it. Yes. Yes, and that is in the record, Judge. That was addressed in the record, that he told them, look, I would go. Now, on the day of the interview, Judge Wilkerson, as you asked about where they came and asked him, he told them that he had taken, I don't remember, it was the muscle relaxant that particular day, the little bit that he had, because of what he was going to do with that interview. He takes it as need be. Now, on a public policy standpoint, we already have the opioid issue going on. This man is very concerned about becoming addicted to these things. He doesn't want to go down that path. He takes the pain medication as he needs. Now, if he's in a more rigorous environment or work environment, that's going to escalate those things. One of the primary treatments for people that are dealing with chronic pain, ritalopathies and so on, of spinal issues, is minimal activity. Whether it's sitting, trying to avoid lengthy sitting and that sort of thing, standing, walking, whatever the case may be. Are we allowed to consider the fact that he was denied benefits by the Social Security Administration? No, you are not, Judge. And the reason why they give you that short court answer is it wasn't part of the record during the administrative process. One of the suggestions I had represented to Judge Moon, I think that should happen here. Part of the record, would it be relevant? Maybe. What we would have to do is pull the actual Social Security record, which Harper had a release to get. That would not seem to be a difficult thing to pin down. Whether someone is denied Social Security disability benefits is in the record. Well, yeah, the denial itself is in, but the basis for it is not. And I don't do Social Security, I don't represent him on that. I believe he's still pursuing it, but ultimately it's not in the record. And if Harper made it... Is the fact that he was denied benefits in the record? I want to say it was in the claim file, yes. Other than the one sentence that they referenced in the claim letter, I don't believe they provided any other explanation of why. If he could not do, as he claims, any job in the economy, he certainly would have gotten Social Security benefits. I can't answer that, Judge. What I can tell you is... Well, what I can tell you is, though, to an extent, I would have to defer to anybody that does Social Security. I don't, but I do know this, Judge. Social Security has a complete, distinct, different definition of disability than this insurance policy at issue, which is the contractual relationship between the parties and Heimischoff. This is a... I'm worried about the fact that if we pull the administrator up short here on the grounds that, well, you granted him a long-term disability, now what's changed? Um, what you're going to do is you're going to push administrators in the position of saying, well, we shouldn't do this. We shouldn't grant them disability benefits in the first place because the courts will use that against us in saying, well, what's changed? And so you create an incentive not to do what Hartford did, which was to grant long-term disability. If any time you seek to terminate that status, the courts are going to hold that against you and whack you and say, look, once you're granted long-term disability, that's got to be a semi-permanent status. I worry about that. Sometimes these things have unintended consequences, and the unintended consequence here might be that a company is more... that companies are more reluctant to put beneficiaries on long-term disability initially. Okay. I'm out of time, Judge. Think about it a little bit. I'll see you in a little bit. I'll see you in a little bit, Judge. Thank you. Opposing counsel. Mr. Newman? Thank you, Judge Wilkinson. May it please the court. My name is John Nyman. I'm here from Alabama representing Hartford. Judge Moon's decision correctly assessed the realities that underlie both the right rule with respect to the standard of review and the right ruling on the merits in this case. From the court's comments during my colleague's opening argument, it sounds like we'd be better served by addressing the realities that underlie the second question on the merits. But suffice it to say that the decision that my client, Hartford Life and Accident Insurance Company, was in fact the entity... Just tell us why you think it was not an abusive... it was a permissible exercise of discretion to terminate that. Sure, Your Honor. The reality that justified fully Judge Moon's decision on that front was the fact that this very important, undoubtedly important benefit that many of us receive through our employers is in fact a deal between the employee and the insurance company. Both sides have responsibilities, but that means that the employee has certain responsibilities as well. Life, excuse me, disability insurance is not a we'll take it at... we'll take you at your word kind of proposition. An employee always has the responsibility to establish through medical evidence that they are in fact unable to work and therefore in need of a check to offset their inability to work. That meant that when Mr. Griffin first claimed to be disabled and unable to work and needing that check, he couldn't just say, hey, Hartford, I am disabled, trust me on this, start sending me the check. He instead had to come forward with medical evidence that established that he was unable to work. And he did exactly that. He had doctors who explained that in 2012 he was unable to work full time. The doctors expressly said they would not approve of him working at that time in 2012 more than two hours a day. Your view is that the medical opinions change? As of 2014, when Hartford made the decision to terminate his ongoing disability benefit, Mr. Griffin could not and did not provide any doctor's statement that he had similar restrictions and limitations at that time. Let me understand this. In March of 2014, Hartford granted full disability benefits in the more rigorous anti-occupation standard, correct? That's correct, Judge Gergel. And it recognized at that time that Dr. Carmouche, the treating orthopedic surgeon, the spine surgeon, had given the opinion that under no circumstances could this man handle sedentary work even part-time. That's in your record, is it not? I think I disagree slightly, Judge Gergel, with the characterization of what Hartford's conclusion was. It's actually in the record. Would you like me to refer to it for you? Where it actually says the attending physician says he cannot work even part-time. So that comment resulted from communications between the peer reviewer, Dr. Cheichman, and Dr. Carmouche, where Carmouche communicated based on the circumstances that followed Mr. Griffin's surgery in 2013, he could not recommend restrictions or he could not recommend that he go back to work at that time. But at that time, the peer reviewer said based on Carmouche's own statements, initially the peer reviewer said I can't come up with my own restrictions and limitations, I don't have the information. I don't have the opinion that he could work. Then your examiner went back to him and tried to get him to change his opinion. Isn't that right? I disagree with that characterization. Refer to page 306 of the record. And the examiner then says we have nothing if we can't get him to change his opinion. Judge Gergel, I understand the examiner in that circumstance to be saying we've got Dr. Cheichman's statement that he can't provide us anything one way or the other. Actually, when you asked him to give a second statement, he then said, before he had no opinion, he said you want an opinion? He's disabled. That's what Dr. Cheichman said. And then your group granted him full benefits and then six months later, after going through all that where you couldn't get a second opinion, suddenly his benefits are discontinued. What happened between March and September of 2014? So initially what happened? Various things happened, Judge Gergel. One, two, three. Tell me what happened. Let him have an opportunity to get his case out. First of all, there was the interview in May of 2014. And that interview revealed a couple of things. One was that as of May 2014, Mr. Griffin had not seen any doctor in 2014 itself. It also revealed, as the opening argument suggested, that Mr. Griffin was spacing out his medications such that the last time he had had a prescription filled was in 2013. So you're talking about somebody who claims to be unable to work and to be fully disabled but also not taking any medications throughout a five-month period. Counsel indicated he couldn't afford the medication. Is that the reason he was taking them only intermittently to avoid an addiction? I'm not sure that the record definitively reveals why he was not taking the medications regularly. It may well be, as counsel suggested, that Mr. Griffin thought that it was inappropriate for him to take those medications. It certainly is the case that Mr. Griffin suggested that he wasn't seeing doctors because he couldn't afford to see the doctors. No doubt about that. I suspect that even though the claim denial in this case by Hartford did not rely on the Social Security denial, the fact that Mr. Griffin was not seeing doctors may well spring from the Social Security denial. But from Hartford's perspective, that means that the employee was not fulfilling his obligations under the policy in terms of going regularly to doctors who would say that at the time in question this patient was unable to work because of medical evidence and had no restrictions. Your view is that an administrator can periodically request an update from treating physicians  the present status of the individual were. Let me see if I understand your argument. Your argument was that they were willing initially at the time he went on disability to give a definitive statement but as time went on he was unable to produce a statement to the effect of he continues to be on disability and continues to be unable to work. In other words, the definitive statement that was the basis of the award earlier was not provided later. That's exactly right and in fact he saw doctors the statements that Hartford received from doctors that related to his condition in 2014 did not provide any restrictions or limitations at all. The last statement Judge Gergel that Hartford received from Dr. Carmouche said that Dr. Carmouche would not release Mr. Griffin to work until Dr. Bravo had released Mr. Griffin to work. So then Hartford contacts Dr. Bravo and Dr. Bravo says I'm not placing any restrictions and limitations on Mr. Griffin because I saw him once in 2013 so that there are no restrictions there. I thought after that that Dr. Teichman went in 2014 to Dr. Carmouche, got him on a telephone conversation and Dr. Carmouche says the man cannot work. 2014. He's not able to afford to go back to Carmouche because he doesn't have any money but they get him on the telephone and then Dr. Teichman writes a letter to Hartford and says that Dr. Carmouche notes the patient has significant degenerative pathology, page 756 and that he says I must I'm forced to defer to the treating physician who says he cannot work. Isn't that right? As of that time that's what the peer reviewer says but in the intervening time Hartford learns that first of all Mr. Griffin is not seeing doctors, not taking medications but they also get indications both from Dr. Bravo and then Dr. McLaughlin, the chiropractor, suggesting that they even though McLaughlin has seen Mr. Griffin during this time that McLaughlin cannot impose restrictions and limitations. The chiropractor wrote you back and said you misunderstood. I didn't put him on restrictions because he wasn't working. He said you have misunderstood my response to that question. That's right in the record. I know which letter and phone call you're referring to Judge Gergel but I disagree with the ultimate characterization of what Dr. McLaughlin was saying there. Initially Dr. McLaughlin signs this letter that's at JA 282 where excuse me that's not the letter it's at JA 665 a letter in August of 2014 where he's asked are you placing restrictions on Mr. Griffin and he checks off the box for no. But then there's a box afterwards that he's not supposed to check off if he's checked off no on the first question that says if you answered yes to the first question explain why and he answers that question or he says if you answer yes to that question is there any reason why he can't go or I'm forgetting the exact nature of the question but it says something along the lines it's asking whether there's any reason why he can't go back to work and there McLaughlin explains that he saw him in 2012 and based on his evaluation of him in 2012 he wasn't fit to go back to work at that point in time. Then he wrote a letter on September 23rd 2014 605 of the appellate record he says I think Mr. Griffin is being honest about his pain and discomfort after he's going to require surgery I think he will have some disability afterwards and that I have been misunderstood that I didn't put him on restrictions because he wasn't working at page 605 he then had a follow up phone call and said you need to go back to Dr. Carmouche and talk to him I'm a chiropractor I mean that's what Hartford's relying on? So yes there's a follow up call at J272 where Hartford calls and this is during the appeals process in September not the initial claims denial in August. So during this appeals process a letter is received from Dr. McLaughlin where he says the things that you have said Judge Gerber. During the follow up phone call Dr. McLaughlin explains I'm basing those comments on the self report by Mr. Griffin. I'm not basing that on Why was it so difficult to get a clear cut statement on one sort or another at the time of termination? This seems to be fuzzy and ambiguous and all the rest Well all the relevant doctors were contacted including Dr. Carmouche, Judge Gerber and Carmouche just simply did not respond in March of 2014 but not in August of 2014 and you have statements from doctors such as Carmouche at one point in time who says that Mr. Griffin probably can do more than he thinks he can that either Dr. Carmouche thinks he can or that Mr. Griffin thinks he can Ultimately it's up to Mr. Griffin to provide that medical evidence It's six months later but saying that Yes, Dr. Carmouche repeatedly refused to respond to Hartford's requests and to the extent that there's a suggestion that Mr. Griffin should and to the extent there's a suggestion that a functional capacity evaluation should have been performed that's Griffin's end of the bargain with respect to the disability insurance policy. Disability insurance is not health care is not health insurance It's not up to the disability insurer to send a doctor to perform a functional capacity evaluation or otherwise That's something that Mr. Griffin had to do That's not my discipline I'm not an occupational therapist I'm an orthopedic surgeon and I can tell you based on this severe spine degeneration this man cannot sustain work That's what he told you, right? That's what he told Dr. Teichman based on the last time he had seen Mr. Griffin I believe had been in 2012 that's what he tells Dr. Teichman in early 2014 but this is six months later and the mere fact that Hartford gave Mr. Griffin the benefit of the doubt and did the right thing in terms of exercising caution in early 2014 does not mean that Mr. Griffin is entitled to a disability check for the rest of his life He's got an obligation to come forward with evidence to rule otherwise Mr. Griffin wants the court to do would mean effectively a company like Hartford would be punished for not conducting all of this analysis that it ended up conducting in May and June and August 2014 in early March and thus denying disability benefits early So how often do you when you have someone on long term disability how often do you come up for review as to whether the individual is still prevented from as I say we have this very broad standard for performing the essential task of any occupation but how often is that status determination of long term disability reviewed every three months, every six months how often? Judge Wilkinson the record suggests that there is something called a milestone call that is made every three months or so and you see those calls made at least early on in the process in this very long document you've got in volume two of the JA from JA 268 to 379 it looks like every three months or so Hartford would make calls to Mr. Griffin and ask him what the status of his disability was and his ability to work was it's telling I think that there are several calls that Hartford made to Mr. Griffin where Mr. Griffin responded effectively do I have to keep on taking these calls I don't want you to I feel like I shouldn't have to establish that I'm disabled continually and Hartford explained to him My concern here is is if we if we transform long term disability into some form of semi entitlement once you first get on the companies are going to be really reluctant to put people on because then they're going to be charged with having made an enduring decision even in the face of a change of status so what may seem the can boomerang badly in terms of making companies very reluctant to put someone on long term disability I'm not sure that the direction we want to go is this a danger I think it certainly is a danger if the ruling is that based on the fact that Hartford was somewhat unsure about his status in March of 2014 and went ahead and continued his benefits for a few months more investigation Griffin provided no further evidence of his disability I think in that circumstance all the incentives would be for Hartford to deny benefits as of March 2014 to say he can't satisfy any occupation definition that came into play in March of 2014 and at the end of the day people in Mr. Griffin's shoes would face terminations or at least incentives for the companies to terminate earlier than they did here How could you possibly have turned down long term benefits in March of 2014 when you had the treating physician saying unqualifiedly he can't do the work in your own second opinion agreed with it? I mean there wasn't really a lot of imagination it took and that's why I keep asking you what was the new evidence because you had this MRI that is just devastating about how bad his back is that doesn't change and you have the what we don't have is that this man does not have the money to go back to a doctor to keep getting opinions and for that he can lose his benefits Well so what changes I think as of between March of 2014 and September of 2014 is the fact that Hartford gets all this new information that he is Judge Gergel that he's not excuse me for interrupting that he's not seeing doctors and the hope is with respect to anybody who gets put on disability that eventually they get better and it cannot be the case that the company has to presume that anybody put on disability will be on disability for the rest of their life given that that's the arrangement that employees enter into with these companies the arrangement also has to be that the employee has an ongoing obligation to see doctors take medications if they're going to help them get better and to do things like PT to get better so it was entirely appropriate for Hartford to say to Mr. Griffin you've got to keep seeing doctors and if you cannot get a doctor who will tell you that you are currently restricted and limited that you cannot work any occupation currently then you're no longer entitled to maintain your status under the policy Between March and September of 2014 when did the actual surveillance take place? The surveillance I believe took place it took place before his interview in May so I believe it was either May or I know it was earlier than May it was March 27 and 28 and then there was surveillance on April 16 and 17 as well So what significance do you attach to that? We haven't abandoned it as Mr. Griffin's attorney suggested but I do suggest that it's not a substantial factor in the analysis it did not show that he was unable to move around to that extent it was somewhat He told y'all he was driving everything he did was consistent with what he had told Hartford Other than that it's not as if Hartford said this surveillance definitively shows that he's able to work 8 hours a day I was going to direct my question at that whether the Hartford is allowed to consider the observations of his mobility going upstairs, sitting in an interview for an hour, standing just once just to stretch out moving his hands and arms seeing him in the surveillance that he gets around without any kind of limp or hesitation, gets in and out of the truck, goes in the shop picks up the kid. These are observations and then you have Kamusha's statement that I'm not sure this man can't do more than what he says he's doing These suspicions sort of seem to me would justify a demand for a better evidence that he's disabled All these are indicative he can do something because there are just many, many jobs where you can get up and down and you can adjust and sit at a desk Agreed Judge Niemeyer The other thing that's revealed during the interview is the fact that he's driving an hour and a half with one stop to take certain appointments But on My question is you sort of discounted that a little bit I'm wondering, is Hartford allowed to take those facts into observation or is it limited to these statements that are being made by various doctors about his condition? No, it absolutely is allowed to consider those things They are a factor in the abuse of discretion analysis, but especially since Judge Gergel One thing that happened in the interchange between Teichman and Carmouche was that Teichman said to Carmouche, well what about modifying his work such that he stands up during part of the day or moves around during part of the day and Carmouche declined to opine on that issue He didn't change his opinion, he said he can't do the work even part time Well, that's he declined to, that's true but he declined to opine on what would happen if modifications occurred and given what Hartford saw during the interview and otherwise Hartford's decision here was correct, but at the very least was no abuse of discretion  We'd like to hear from you in rebuttal, sir Judge Wilkinson you made a long statement to me right before we wrapped up my initial argument to the court and I wanted to come back and hit on that and also a phrase that I think you used or expressed a concern on counsel's argument and that was the phrase semi-entitlement and I want to be clear here in no manner, shape, or form am I advocating for that sort of analysis. What I am where an ERISA fiduciary makes a decision if it's going to change that decision, reverse itself, it has to have some new justification to explain that. ERISA's supposed to be a higher standard. It seems to me he gets disability benefits to replace his income if he can't work and any job for which he has an education Here this man had an operation in 2013 gives an opinion as of that time he didn't see him that he couldn't work, but he also says he believes the guy can do more than he thinks he can do and he also said I'm not a functionality type guy. So the disability carrier says we'll give you disability benefits until we can fully explore this. They conduct surveillance, they do an interview they continue to call the doctors they give them an appeal and nothing comes forward to say why can't this man sit at a desk or get up and down for some of these various jobs and the fact of the matter is people do get health does improve, the body has self healing, it may not get totally better, so it seems to me the carrier can time to time check are you still having troubles with the expectation maybe things are getting better that's, I don't know if you call that a change or not, but you can't assume that the condition that somebody has after an operation in 2013 is going to last for the rest of his life. So the question is it's not a change, it's just a generalized improvement in healing from disabilities and so the burden is on the beneficiary to demonstrate that he can't work and he's going to get the benefit and he sort of got irritated at being asked that question. Well, in a roundabout response Judge folks get aggravated all the time for all sorts of reasons but I understand I understand, but coming back to the issue I'm not trying to say that they can't they have an ongoing duty every month or however frequency I think one of the judges asked how often does Hartford do it and I believe typically they start out every month and it's every three months and it's once a year in what's called a SAM unit but they have arguing for some notion that there's a gotcha in other words once Hartford says we're going to give you benefits there has to be some dramatic change before they can reverse that and my suggestion is they in a moment when they didn't have the full information they're giving them the benefit of the doubt and investigating. They didn't make their conclusion in March until what August when they made their first conclusion? Well I would disagree because internally they did it shortly after Teichman all the internal notes and everything indicate I want to say it was March don't hold me to that exact I want to say it was either March or it was right after the Hartford Teichman Right they didn't well going to your question Judge though there's an ongoing that when they terminated his benefits was right around August right after the surveillance and after the impersonal interview. Now what I will tell you because it goes back to the question what additional medical evidence did they have to change? They didn't have anything new from Teichman because on the appeal despite the claim regulations requiring them to go and get a medical professional they didn't. Doesn't that shift the burden? I don't know that it's a burden shifting as far as when we're under A and C but it is indicative of a failure to file. So what you're saying is that once you go on disability then the burden shifts to the administrator to prove that there's been no improvement? No Judge I'm not But it sounds like you're having a presumption of continuing disability that would be one way to phrase it or another way to phrase it would be that this is a burden shifting scheme and the burden shifts to the administrator to prove continuing disability once long term disability is awarded. I think it kind of creates an estoppel position not a burden issue so by way of example if all three of you decided That can't be the law What's that? You can't it can't be a stop but the more important issue is is there evidence afterwards that he was getting better or that his condition changed but it can't be that the carrier is stopped. No and when I say a stop what I'm doing is from the fiduciary standpoint my time's out if I can complete here Judge and that is this once you make a decision if Harford said my eyes are blue they made an investigation and said my eyes are blue and six months later they come back to me and say no your eyes are brown with nothing changing in between the position here is that if a fiduciary I mean somebody has a hip operation and they're in the hospital for a period of time then they can't work they're out totally out they're lying down they're trying to get improved six months later they're totally with that now there's no the idea is that operations are designed to make people better and you call to find out is he getting better right there's nothing problem I have no issue with investigation Judge that's what Kamush is saying Kamush said that way back in 2013 spoke in March 2014 had not seen him and did say based on 2013 sure he's disabled because he just had an operation but he had not seen him in March and so now they go ahead and do surveillance and they go and interview him and they keep calling for a functionality and go see a doctor they entreaty somehow to demonstrate that he can't work and every indication suggests that he could do something this is these observations and you suggest I don't know if you suggest otherwise I'd like to know what evidence after March suggests that he couldn't work oh you have McLaughlin's opinion Judge let me ask you let me ask you one question yes let's suppose that the plaintiff's condition undergoes a deterioration and that the doctors have expressed to him a willingness to provide a definitive statement that he's not suited for performing the essential task of any occupation could he then reapply to the company for a resumption or a return to long term disability in other words I wonder if this is not a fluid process and if he at some point in the future found physicians who were willing to give an updated statement that conformed to the that matched the terms of the policy whether there would be a chance that the long term disability benefits would resume under this policy Judge I don't believe so because he would have to become an employee again and remain covered under this policy and he's no longer an active employee but is there any legal bar to resumption such as a break in employment or what? I'm doing the detailed analysis my gut's going to tell me that the contract's going to say once you're no longer covered you're no longer covered and so at the end of this disability if there was a break of six months or what not and he gets a pick some disease I can't tell you definitively and a lot of this all goes back to even Judge Moon speculated a lot of this we're talking about here is speculation this is why ERISA requires let's have a full and open dialogue during the claims process especially when these folks are unrepresented and that's why I would posit that to get the answers to the majority of the questions this court has that a remand would have been warranted at the very least Thank you judges Thank you for the time I'm down in Greek Council and move into our next case
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Richard Mark Gergel